## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| THE DEMOCRATIC PARTY OF GEORGIA, INC., AND AFG GROUP INC, <br><br>        PLAINTIFFS, <br><br>   V. <br><br> ROBYN A. CRITTENDEN, IN HER OFFICIAL CAPACITY AS SECRETARY OF STATE OF THE STATE OF GEORGIA; STEPHEN DAY, JOHN MANGANO, ALICE O'LENICK, BEN SATTERFIELD, AND BEAUTY BALDWIN, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE GWINNETT COUNTY BOARD OF REGISTRATION & ELECTIONS; AND MICHAEL COVENY, ANTHONY LEWIS, LEONA PERRY, SAMUEL TILLMAN, AND BAOKY VU, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE DEKALB COUNTY BOARD OF REGISTRATION & ELECTIONS, <br><br>        DEFENDANTS. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CLASS ACTION**[1] <br><br><br><br> Civ. Act. No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

[1] "Class Action" is included in the caption pursuant to LR 23.1(A)(1) in the event the Court deems it necessary to certify a defendant class.  *See infra* ¶¶ 35-40 *et seq.*

**INTRODUCTION**

1.      "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).  "No right is more precious in a free country than that of having a voice in the election of those who make the laws … Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  The right to vote includes "the right of qualified voters within a state to cast their ballots **and have them counted**." *United States v. Classic*, 313 U.S. 299, 315 (1941) (emphasis added).

2.      Accordingly, Plaintiff AFG Group, a registered Georgia corporation, d/b/a Stacey Abrams for Governor, and the Democratic Party of Georgia ("Plaintiffs") file this Complaint for injunctive relief under 42 U.S.C. § 1983 and other statutes against Defendant Robyn A. Crittenden, in her official capacity as Secretary of State for the State of Georgia ("Crittenden"), the five members of the Gwinnett County Board of Registration and Elections, Stephen Day, John Mangano, Alice O'Lenick, Ben Satterfield and Beauty Baldwin, in their official capacities ("Gwinnett"), and the five members of the DeKalb County Board of Registration and Elections, Michael Coveny, Anthony Lewis, Leona Perry, Samuel

Tillman and Baoky Vu, in their official capacities ("DeKalb")  (together "Defendants").

3.     Plaintiffs also assert claims against a class of defendants comprised of the various Superintendents and Boards of Elections in each and every one of the 159 counties in the State of Georgia ("Defendant Class").

4.     This election is a matter of great and grave national interest.  *See* Foley, Edward B., <u>Democratic legitimacy is on the line in Georgia</u>, The Washington Post (Nov. 9, 2018 ("Every move in Georgia's vote-counting process needs to be watched with extra vigilance to make sure it is not tainted by the improprieties that have already occurred," including the rejection of valid absentee mail-in ballots rejected on the basis of "technical trivialities."), available at https://www.washingtonpost.com/opinions/democratic-legitimacy-is-on-the-line-in-georgia/2018/11/08/957fee80-e394-11e8-b759-3d88a5ce9e19_story.html.).

5.     The 2018 election in Georgia resulted in the filing of a historic number of provisional ballots.  Each of these tens of thousands of ballots represents the voice of a Georgian voter, and now, those voices are at risk of not being heard.  Under Georgia election law, counties can verify provisional ballots only up until three days after Election Day, or through and including November 9, 2018.  This short cure period is wholly inadequate to vindicate voters'

constitutional rights in light of the historic number of provisional ballots that have

been cast, and the confusion and disarray that Plaintiffs have witnessed as of this

filing across multiple counties during the cure process.  Voters with adequate

information to ensure that their votes should be counted – votes Plaintiffs believe

are likely to be cast for their favored candidates – have been turned away by

election superintendents and boards of registrars, or told that they are being added

to a list and will be called when a decision is made (well past the end of the cure

period).

6.     Under Georgia law, it appears that any voters whose provisional

ballots have not been resolved by November 9, 2018 will be disenfranchised,

simply because the counties in which they respectively reside could not address

their ballots in time. There is no reason it needs to be this way.  Counties are not

required by statute to certify election results until November 13, 2018. O.C.G.A.

21-2-493.[2] The Secretary of State is not required to certify the results until

November 20, 2018. O.C.G.A. 21-2-499.

---

[2] With regard to counties that have already certified their returns, O.C.G.A. 21-2-493(l) provides that where election returns change as a result of a court order, the elections superintendent must file and certify corrected returns on behalf of her county with the Secretary of State.

7.      Plaintiffs file this action to seek two types of relief. **First**, Plaintiffs seek declaratory and injunctive relief requiring the acceptance of certain absentee ballots. Specifically, Plaintiffs seek an order requiring the Defendant Gwinnett to restore the votes of at least **1,095** qualified electors who properly submitted absentee ballots in the November 6, 2018 General Election (the "Election") and had them arbitrarily and unlawfully rejected by Gwinnett due to missing or insufficient information requested in the elector oath

8.      In addition, Plaintiffs seek an order and judgment:

    a. as to the Defendant Class that has already certified election results, directing the Class to restore the votes of qualified electors who properly submitted absentee ballots in the Election and had them arbitrarily and unlawfully rejected due to missing or insufficient information requested in the elector oath, and to certify and file corrected returns; and

    b. directing Defendant Crittenden to instruct those counties having not completed their tabulation or certification of their results from the Election to accept these ballots and count them.

9.      **Second**, Plaintiffs seek injunctive relief relating to provisional ballots. Specifically, Plaintiffs seek a court order and judgment:

a. requiring counties to accept cures for and to verify provisional ballots until November 14, 2018 at 5:00 p.m.;

b. counties to treat provisional ballots cast by a voter registered in another county the same as they would provisional ballots cast by a voter within the wrong precinct of the same county as described by O.C.G.A. § 21-2-419(c)(2);

c. as to the counties in the Defendant Class that has already certified election results, directing the Class to restore the votes of qualified electors as described in (a) and (b) in this paragraph, and to certify and file corrected returns;

d. directing Defendant Crittenden to instruct those counties having not completed their tabulation or certification of their results from the Election to accept these ballots and count them; and

e. enjoining the Defendant Class and Defendant Crittenden from certifying their returns until November 14, 2018, so that the voices of these Georgia voters can be heard while imposing a relatively small burden on the counties and the State.

10. This action is related to the validity and acceptance of absentee ballots by Gwinnett County and other similarly situated counties, and is therefore a case

related to *Martin v. Kemp*, 1:18-cv-4776-LMM (N.D. Ga.) and the case that was consolidated with *Martin* for purposes of considering preliminary injunctive relief, *Georgia Muslim Voter Project v. Kemp*, 1:18-cv-4789-LMM (N.D. Ga.). This action also relates to *Martin* and *GMVP* because it concerns how Georgia counties determine whether ballots cast in the Election are valid and should be accepted under Georgia law – and the State's role in guiding the counties toward enforcing voters' fundamental rights to vote, or not.

## PARTIES, JURISDICTION, AND VENUE

11.    This Court has jurisdiction of this action a) pursuant to 28 U.S.C. §§ 1343(a) and 42 U.S.C. § 1983 and 1988 because it seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the First and Fourteenth Amendments to the U.S. Constitution, and b) pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States.

12.    This Court has jurisdiction to grant both declaratory and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202.

13.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this district and division.

14.     AFG Group Inc, d/b/a Stacey Abrams for Governor, is a properly

constituted and registered domestic nonprofit corporation organized for political

activity purposes under section 527 of the Internal Revenue Code of 1986, as

amended, supporting the candidacy of Stacey Abrams for Governor of the State of

Georgia (hereinafter "the Abrams Campaign").

15.     The Abrams Campaign represents a diverse group of stakeholders,

including elected officials, candidates for elected office, state committee members,

advisory caucuses, affiliate groups, grassroots activists, and active voters, all of

whom support Ms. Abrams's candidacy. The Abrams Campaign has worked to

increase turnout to elect Ms. Abrams and to ensure that all eligible Georgia voters

have access to the franchise.

16.     The Abrams Campaign has direct organizational standing to bring

claims for violations of the Georgia election code and of the U.S. Constitution.

17.     The Democratic Party of Georgia ("DPG") is a state committee, as

defined by 52 U.S.C. § 30101(15), and the official Democratic Party organization

of the state of Georgia.

18.     DPG represents a diverse group of stakeholders, including elected

officials, candidates for elected office, state committee members, advisory

caucuses, affiliate groups, grassroots activists, and active voters. DPG works to

increase turnout to elect Democratic candidates at both the state and Federal level, and assists Georgians to ensure that all eligible voters have access to the franchise.

19.     DPG has direct organizational standing to bring claims for violations of the Georgia election code and of the U.S. Constitution.

20.     Gwinnett's violation of the Georgia Election Code in a manner that decreases turnout is directly contrary to DPG's organizational mission and to the mission of the Abrams Campaign, both of which include increasing voter turnout in elections and helping to elect Democratic candidates to office at both the state and Federal level.

21.     In particular, both the Abrams Campaign and DPG devoted extraordinary resources during the 2018 election cycle to encouraging all voters to consider voting by absentee mail-in ballot. The rejection of absentee mail-in ballots frustrates that organizational mission, not to mention results in fewer votes for Democratic candidates.

22.     Defendants' and the Defendant Class's violation of the Georgia Election Code in a manner that decreases turnout is directly contrary to Plaintiffs' respective missions.

23.     Further, the rejection of absentee ballots, the inadequate cure period and procedures for provisional ballots, and Defendants' failure, including the

failure of the Defendant Class, to comply with state law have caused, is causing, and will in the future cause a diversion of Plaintiffs' financial and personnel resources. Plaintiffs each spent substantial time and energy in advance of the election attempting to cure Gwinnett's policies and procedures concerning absentee ballot examination and rejection. Plaintiffs each spent additional substantial time and energy before and after the election attempting to meet, correct, and cure DeKalb's policies and procedures concerning provisional ballot issuance, refusals to issue, notification of rights of provisional voters, and cures for provisional voters.

24.     For example, both DPG and the Abrams Campaign spent significant time and resources educating its staffers, volunteers, and candidates' campaigns, as well as registered voters, about the order of this Court compelling Gwinnett to notify any voter whose absentee ballot was rejected due to a purported mismatch of the absentee voter's signature with the signature Gwinnett had on file. DPG expects to continue to devote organizational resources to the problem in the future. DPG is receiving calls into its Voter Protection Hotline from aggrieved absentee voters in Gwinnett County requesting DPG's assistance. Handling those calls diverts DPG employees and volunteers away from assisting other voters in the State of Georgia.

25.     By way of further example, Plaintiffs are committed to assisting their members, staff, and volunteers, and the electorate more generally to ensure that their provisional ballots are counted. Plaintiffs have invested and are investing considerable resources to this end. These efforts include reaching out to voters and assisting them with information and resources in order to cure their provisional ballots. Plaintiffs have numerous competing priorities for their limited resources, and a short cure period has required them to divert resources to curing provisional ballots that would otherwise have been used on other, time-sensitive priorities.

26.     For example, the Abrams Campaign is preparing simultaneously for a recount and for a runoff election for the gubernatorial contest, and must pull its volunteers and employees from assisting with those preparations to provide expedited assistance to its supporters and voters.  Likewise, several Democratic candidates are preparing for recounts or runoff elections in Georgia, including the Democratic candidate for Secretary of State for the State of Georgia, and DPG must pull its volunteers and employees from assisting those candidates so that they can provide emergency assistance to Georgia voters. Volunteers and employees who would otherwise be staffing the DPG's voter protection hotlines must be redeployed to assist voters in curing provisional ballots at precisely the same time the voter protection hotline is experiencing its highest call volume. A reasonable

cure period for provisional ballots would allow Plaintiffs to more effectively and efficiently manage their respective resources without burdening their organizational missions and objectives.

27.    Plaintiffs also each have representational standing based on injuries to its members.

28.    DPG's members include both current elected officials and current candidate for office, including candidate for Georgia's Seventh Congressional District, Carolyn Bordeaux, and other candidates who appeared on the ballot in Gwinnett County.[3] Those candidates are injured if fewer absentee ballots are counted. DPG's membership also includes the affected electorate itself, who have unquestionably been injured by having their ballots outright rejected, by having an undue burden placed on their voting rights, and by the uncertainty of not knowing whether absentee ballots received at the end or after the close of absentee in-person voting would in fact be accepted and counted as cast.

29.    The Abrams Campaign was established and operates to encourage participation in the democratic process by all eligible voters and to support candidate Stacey Y. Abrams for the office of Governor of Georgia.

_____

[3] As of November 9, 2018, Bordeaux trailed another party's candidate by fewer than 900 votes out of more than 278,000 votes cast and counted.

30.    Robyn A. Crittenden is Georgia's Secretary of State and is named solely in her official capacity as such. Crittenden is Georgia's chief election official. In that capacity, she is responsible for promoting and supporting accurate, fair, open and secure elections for the citizens of Georgia and for implementing election laws and regulations. She also is responsible for tabulating the consolidated returns of the counties of Georgia, for directing county election superintendents to conduct recounts when required under Georgia law, and for certifying the vote total for federal and state offices, among other races. *See* Ga. Code Ann. §§ 21-2-50(b), 495, 499; Ga. Comp. R. & Regs. 590-1-1-.01, .02.

31.    Crittenden was appointed Georgia's Secretary of State on Thursday, November 8, 2018, replacing Brian P. Kemp, who resigned his office after overseeing the election culminating on November 6, 2018, in which he ran as a candidate for Georgia's governor.

32.    Defendants Stephen Day, John Mangano, Alice O'Lenick, Ben Satterfield and Beauty Baldwin are members of the Gwinnett County Board of Registration and Elections, which collectively acts as the election superintendent under the Georgia election code and is statutorily responsible for implementing Georgia's election procedures within Gwinnett County, including the provisions regarding absentee ballots. Gwinnett is responsible under Georgia law for

implementing the procedures set forth in O.C.G.A. § 21-2-386(a)(1)(C). They are also responsible for implementing the regulations that govern absentee ballot examination, acceptance, and rejection. Ga. Comp. R. & Regs. 183-1-14-.01.

33.     Defendants Michael Coveny, Anthony Lewis, Leona Perry, Samuel Tillman and Baoky Vu are members of the DeKalb County Board of Registration and Elections, which collectively acts as the election superintendent under the Georgia election code and is statutorily responsible for implementing Georgia's election procedures within DeKalb County, including the provisions regarding provisional ballots. *See* O.C.G.A. §§ 21-2-40, 70, 418, 419.

34.     In Plaintiffs' proposed class, Defendants Gwinnett and DeKalb represents the boards of registrars and election superintendents of Georgia's 159 counties that each exercises similar powers within its respective jurisdiction.

## DEFENDANT CLASS ACTION ALLEGATIONS

35.     Certifying a defendant class action is unnecessary because an order enjoining the Secretary of State will have the effect of enjoining all 159 county boards of registrars. The Secretary of State's Office routinely issues guidance to county registrars statewide, who, on information and belief, follow the Office's guidance.

36.     Nonetheless, to the extent the Court deems it necessary to join all the county boards of registrars as parties to this suit, Plaintiffs assert claims against a class of defendants comprised of the various boards of registrars and elections superintendents in each and every one of the 159 counties in the State of Georgia pursuant to Fed. R. Civ. P. 23(a) because:

a.   The members of the Defendant Class are so numerous that joinder of all of them is impracticable.

b.   There are questions of law and fact that are common to all members of the Defendant Class.

c.   In addition, to the extent that the Gwinnett Defendants are representative of the interests of the other members of the Defendant Class, the claims and defenses of the Gwinnett Defendants in this case are typical of the claims and defenses of the Defendant Class.

d.   The Gwinnett Defendants, as representatives of the Defendant Class, will fairly and adequately represent the interests of the Defendant Class.

37.     The case can be maintained as a class action pursuant to Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against individual class members would create the risk of inconsistent or varying adjudication with respect

to individual class members that would establish incompatible standards of conduct.

38.    Certification is also appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because the Defendant Class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.

39.    Joinder would be impracticable because there are 159 county boards of registrars. All county boards of registrars will share a common set of defenses available in this challenge to the constitutionality of the adequacy of Georgia's three-day cure period for provisional ballots. Because all the county boards of registrars are simply doing what the statute requires, their defenses will not vary based on individual facts.

40.    For the same reasons, the claims of proposed class representatives Gwinnett and DeKalb will be typical of those of the other counties. The will also be adequate representatives of the class. As elections officials of two of the largest counties in Georgia, they will also have superior resources and experience necessary to litigate this matter.

## FACTS – ABSENTEE BALLOTS

### GEORGIA'S ABSENTEE BALLOT VERIFICATION PROCESS

41.   Gwinnett County elections officials have issued and received absentee ballots throughout much of October and November 2018.

42.   A registered Georgia voter seeking to vote by absentee mail-in ballot first completes an absentee ballot application. *See* O.C.G.A. § 21-2-381(a).

43.   The voter submits that application to her county elections office by mail, by email, by fax, or in person.

44.   The county registrar then determines whether the voter is registered and whether the signature on the application matches the voter's signature the registrar has on file. O.C.G.A. § 21-2-381(b)(1).

45.   If the county verifies the applicant's eligibility, the registrar mails an absentee ballot to the voter along with two envelopes of different sizes. *See* O.C.G.A. § 21-2-381(b)(2), 384(b).

46.   Upon receipt of the absentee ballot, the voter completes and places the completed absentee ballot in the smaller envelope and seals it. The larger envelope includes an oath swearing to eligibility that contains several blanks for the voter to complete prior to mailing. O.C.G.A. §§ 21-2-384(b), (c), 385(a).

47.   O.C.G.A. § 21-2-384(c)(1) provides model language for the oath:

I, the undersigned, do swear (or affirm) that I am a citizen of the United States and of the State of Georgia; that my residence address, for voting purposes, is ____ County, Georgia; that I possess the qualifications of an elector required by the laws of the State of

Georgia; that I am entitled to vote in the precinct containing my residence in the primary or election in which this ballot is to be cast; that I am eligible to vote by absentee ballot; that I have not marked or mailed any other absentee ballot, nor will I mark or mail another absentee ballot for voting in such primary or election; nor shall I vote therein in person; and that I have read and understand the instructions accompanying this ballot; and that I have carefully complied with such instructions in completing this ballot. I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law.

____

Elector's Residence Address

____

Year of Elector's Birth

____

Signature or Mark of Elector

48.    On information and belief, most counties, including Gwinnett, deviate

from the model language by changing formatting and phrasing throughout the oath.

49.    Election forms and information must be given in English and in

Spanish in Gwinnett County under Section 203 of the Voting Rights Act of 1965,

as amended.[4] A true and correct copy of the Gwinnett absentee ballot oath is attached as **Exhibit 1**.

50.     One of the blank spaces on the larger envelope asks the voter to enter the year of the voter's birth. This is a change from previous years, when the voter was asked to fill in the day and month of the voter's birth.

51.     Voters must sign the oath on the envelope and write their residence address on the envelope.

### GEORGIA AND FEDERAL LAW COMPEL ACCEPTANCE OF ABSENTEE BALLOTS WHERE THE VOTER CAN BE VERIFIED

52.     Georgia law does not require elections officials to reject absentee ballots that do not contain the voter's address or the voter's date, month, or year of birth. *See Jones v. Jessup*, 249 Ga. 531, 533 n.5 (2005) (citing O.C.G.A. § 21-2-386(a)(1)(C)).

53.     The State of Georgia, through the Attorney General and the State Elections Board, have expressed the view that the Voting Rights Act forbids the elevation of form over substance in rejecting absentee ballots solely due to missing address or birthdate information. *See* State Election Board Public Meeting and

---

[4] *See* Mestel, Spenser, IT'S ALREADY HARD TO VOTE IN GEORGIA — AND EVEN HARDER IF YOU SPEAK ONLY SPANISH, The Intercept (Nov. 4, 2018), available at https://theintercept.com/2018/11/04/georgia-voting-gwinnett-county-section-203/ .

Hearings, Sept. 11, 2018, attached hereto as **Exhibit 2**, at 2-3 (citing 52 U.S.C. §

10101 and O.C.G.A. § 21-2-386(a)(1)(C)) ("the omission of the additional

information of residence address and/or day and month of birth would not be

material to that voter's qualifications and the absentee ballot should be counted").

54.     The State is aware that state and federal law prohibit county registrars

from rejecting absentee ballots solely due to missing or insufficient oath

information for several years. *See* State Election Board Public Meeting and

Hearings, March 23, 2016, attached hereto as **Exhibit 3**, at 3-4, 9-10 (citing 52

U.S.C. § 10101 and O.C.G.A. § 21-2-386(a)(1)(C)).

55.     Gwinnett County elections officials nonetheless have consistently

rejected absentee ballots cast in the Election that do not contain the voter's address

or the voter's date, month, or year of birth, even though that information is

irrelevant to confirming the voter's identity.

**GWINNETT NONETHELESS IS REJECTING ABSENTEE MAIL-IN BALLOTS ON UNLAWFUL GROUNDS**

56.     283,839 voters attempted to vote absentee by mail in the Election. *See*

November 7, 2018 Voter Absentee File, available at

http://elections.sos.ga.gov/Elections/voterabsenteefile.do. 30,302 of those voters

cast their ballot in Gwinnett County. *Id.* As explained herein, however, many of the

absentee mail-in voters had their ballots rejected due to preventable misapplication of Georgia and federal law by Gwinnett's applied practices.

57.    As of November 9, 2018, Gwinnett County elections officials had rejected 1,186 absentee mail-in ballots.

58.    Gwinnett County elections officials have provided the following reasons for rejecting 1,095 of those absentee ballots:

- Year of birth missing;
- Year of birth not a match;
- Current year as year of birth;
- Res[identical] Addr[ess] not a match;
- Res[identical] Addr[ess] and year of birth missing; and
- Insufficient Oath Information

59.    Furthermore, a voter can address the rejection of her absentee mail-in ballot for missing or insufficient oath information only if she receives notice of the rejection and an opportunity to apply for another absentee mail-in ballot to vote again – itself a burdensome and unnecessary process – or to vote in-person to ensure she casts a ballot that will be accepted and counted.

60.    Gwinnett County did not notify significant numbers of voters whose absentee mail-in ballots Gwinnett rejected for reasons of missing or insufficient oath information until November 6, 2018 – indeed, it could not for ballots received on or shortly before the November 6, 2018 deadline for receiving these ballots.

This is clearly too late for any voter whose ballot was rejected to have an opportunity to cure the immaterial flaw, or to race to the polls to vote in person.

61.    An absentee mail-in voter who does not record the information requested by the oath on her outer mailing envelope does not even have the same opportunity to cure her ballot as a provisional voter has, as a provisional ballot can be cured within three days of the close of the polls. *See* O.C.G.A. §§ 21-2-417(b), 419(c).

62.    Absentee mail-in voters lacking this ability to cure missing or insufficient information immaterial to Gwinnett's attempt to confirm the voters' identities are thus denied the ability to participate in the Election relative to in-person voters and absentee mail-in voters who received notice in sufficient time to vote in-person.

63.    On information and belief, Gwinnett is not the only Georgia county to reject absentee ballots for missing or insufficient oath information. DeKalb and Fayette Counties both have rejected absentee mail-in ballots for reasons that appear to refer to missing or insufficient oath information.

## FACTS – PROVISIONAL BALLOTS

### GEORGIA'S PROVISIONAL BALLOT PROCESS

64.     There are several different circumstances in which a Georgia voter

may be required to vote by a provisional ballot.

65.     First, a voter will be required to vote on a provisional ballot if his or

her name does not appear to be on the list of the registered voters in the precinct.

*See* O.C.G.A. § 21-2-418(a).  To vote provisionally, such individuals will have to

provide an affirmation regarding their eligibility to vote and present suitable

identification.  O.C.G.A. § 21-2-418(b).  If within three days of the election (*i.e.*, in

this election, by November 9, 2018), the board of registrars determines that a

person voting timely registered and was eligible and entitled to vote, it shall so

notify the election superintendent and the vote shall be counted.  O.C.G.A. § 21-2-

419(c).  If the registrars determine that the person was entitled to vote but voted in

the wrong precinct, then the board shall so notify the election superintendent, and

the superintendent shall partially count the vote, as to the races for which that voter

would have been entitled to vote in his or her correct precinct.  O.C.G.A. § 21-2-

419(c)(2). Importantly, if after those three days the board is "unable to determine"

that the voter is eligible, the statute provides that the vote will *not* be counted.

O.C.G.A. § 21-2-419(c)(3).  The statute provides that the board of registrars shall

notify in writing voters whose votes were not counted or only partially counted,

but such notification presumably occurs *after* the three day period set out in

Section § 21-2-419(c)(3) has expired, meaning that where a county fails to make a determination within the three day time period, the voters receives no notice prior to their ballots becoming legally void.

66.     Second, a voter will be required to vote with a provisional ballot if he or she does not have or is unable to present at the polling place a valid form of photo identification.  Georgia provides for the following forms of valid identification: a properly issued Georgia driver's license, a valid state or federal government issued photo identification, a valid federal or Georgia employee photo identification, a valid United States passport, a valid United states military photo identification, or a valid tribal photo identification.  O.C.G.A. § 21-2-417(a).  A voter in this circumstance may cast a provisional ballot upon an affirmation of his or her identity, and then has three days—or until November 9, 2018—to bring suitable identification to his or her county board so that the provisional ballot may be counted.  O.C.G.A. §§ 21-2-417(b), 21-2-419.

67.     Third, a voter who registered to vote by mail, but did not comply with the requirement to provide proper identification with that application and is voting for the first time in Georgia, is required to present one of the above forms of identification or a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the

individual.  If the voter does not have any of those forms of identification, the voter may vote by provisional ballot upon an affirmation of his or her identify, and again has three days—until November 9, 2018—to bring suitable identification to his or her county board.  O.C.G.A. §§ 21-2-417(c), 21-2-419.

68.    Fourth, in precincts in which the closing time of the poll was extended by court order, voters voting during the extended time period are required to vote by provisional ballot.  O.C.G.A. § 21-2-418(d).  During the 2018 election, the closing times of several precincts were extended by court order in Fulton County and Gwinnett County.

69.    Fifth, in the event of emergency situations preventing the use of voting machines or other equipment to cast votes, provisional ballots may be used.  O.C.G.A. § 21-2-418(h).  If the name of a voter casting such a provisional ballot does not appear on the list of registered voters for that polling place, then the ballot must be verified under O.C.G.A. § 21-2-419 before it can be counted.

## THE SUBSTANTIAL BURDENS CREATED BY THE INADEQUATE CURE PERIOD

70.    The 2018 election in Georgia has been marred by various irregularities, which, taken together, render the three-day cure period for provisional ballots established by O.C.G.A. § 21-2-419 inadequate to safeguard the constitutional rights of Plaintiffs and Georgia voters.

71.     Even by Defendants' own account, there were over 21,000 provisional ballots filed in the 2018 election in Georgia.[5]  This was significantly more provisional ballots than were cast in the 2016 presidential election, even though overall turnout in 2018 was slightly lower than in 2016.

72.     This historic number of provisional ballots was due to a number of different factors.  First, reports indicated that prior to the election, then-Secretary of State and candidate for Governor Brian Kemp had held up 53,000 voter registrations, predominantly from minority voters, because they did not clear a new "exact match" process that he had implemented.  Under this process, simply missing an apostrophe in a name could result in a voter being placed in a "pending" status or found to be missing from the voter rolls entirely.  This error may occur at any point in the registration process, including during data entry by a State employee who has never met or spoken with the citizen seeking to register. For example, a clerk for the Department of Driver Services omitting or adding a middle initial of a Georgia citizen seeking to renew her license could result in the

---

[5] *See* in-court testimony of Chris Harvey, director of elections of the Georgia Secretary of State, given on November 8, 2018 in *Common Cause Georgia v. Kemp*, No. 1:18-cv-5102-AT (N.D. Ga.).

driver, and registered voter, later not clearing exact match protocol. The voter, that is, can be entirely free of fault and still placed in "pending" status.[6]

73.     While then-Secretary of State Kemp stated that these issues could be resolved prior to Election Day or at the polls, one county director of elections described to the press "a greater likelihood that voters will end up casting provisional ballots" because of these issues.[7]

74.     In addition, voter confusion was exacerbated this cycle because of voter list purges that then-Secretary of State has led or directed over the past several years.  These purges included the removal of several hundred thousand names last year after then-Secretary of State Kemp had declared his candidacy for Governor.  At least 107,000 of those voters were purged under a "use it or lose it" practice, according to one study, where voters were removed simply because they had decided not to vote in prior elections.

75.     In another case filed in this district, *see Common Cause Georgia v. Kemp*, 18-cv-5102 (N.D. Ga.), the plaintiff documented in detail alarming security vulnerabilities to voter registration information that then-Secretary of State Kemp

---

[6] *See generally Georgia Coalition for the People's Agenda v. Kemp*, No. 1:18-cv-4727-ELR, Order [Dkt. No. 33] (N.D. Ga. Nov. 2, 2018).

[7] WSB-TV Atlanta, "What happens if you show up to vote and you're on the pending list?" *available at* https://www.wsbtv.com/news/2-investigates/live-at-6-what-happens-if-you-show-up-to-vote-and-youre-on-the-pending-list-/852074986.

has long known about.  Yet, not only did he not remedy the problems, he rejected offers of assistance  to do so from private parties and from the U.S. Department of Homeland Security alike and advertised the vulnerabilities to potential malicious actors, including by falsely and with no evidence whatsoever suggesting that the DPG was involved in an attempt to hack Georgia's voter registration information. The vulnerabilities that then-Secretary of State Kemp politicized create a risk that voter registration information was tampered with, creating greater need for provisional ballots and verification.

76.    On Election Day, Georgian voters had to endure numerous irregularities, many of which were caused by the Secretary of State's office.  DPG voter protection volunteers fielded numerous calls from voters who were instructed to vote on provisional ballots because of registration discrepancies.  Voters also had to contend with malfunctioning voting machines, missing power cords, and hours-long lines. These factors not only themselves substantially burdened Georgian voters' rights, they also drove a significant increase in the use of provisional ballots.  In fact, provisional ballots were used to such a degree that at some precincts, voters were told that provisional ballots had run out.  Keeping several precincts open past the 7:00 p.m. closing time by court order due to late openings and technical difficulties further increased the use and demand for

provisional ballots.  The confusion caused by these various issues has led to voters being provided conflicting or inadequate information about how their provisional ballots are to be cured and their votes counted.

77.     Dysfunction and confusion in the cure process for provisional ballots across counties demonstrates that more time to cure is desperately needed.  In DeKalb County, voters who traveled all the way to the county board of elections to cure their ballots were told on the morning of November 9, 2018 that their names are being added to a list and they will be called regarding the cure.  Given that the deadline was November 9, 2018, this is a simply unacceptable state of affairs; voters with the information necessary to have their ballots counted under Georgia election law appear unlikely to have their votes counted.

78.     For example, Lona Tate voted provisionally in DeKalb County. She was told when voting that she was considered an out-of-precinct voter.

79.     Ms. Tate moved from Cobb County to DeKalb County in early October 2018. She changed her address online on October 9, 2018 before 5:00 pm. She thus should have been allowed to vote in DeKalb County using ordinary means.

80.     However, when Ms. Tate appeared at her DeKalb precinct on November 6, after taking public transit and a brisk walk, and speaking to several

poll workers, she was told that her voter file showed her former Cobb County address. She was required by poll workers to cast a provisional ballot. She was not provided a notice of her right to cure her provisional ballot, or a proof of casting a provisional ballot.

81.    Ms. Tate appeared at the DeKalb County Board of Elections on November 9, 2018 at 12:06pm. She came to provide proof of her new address for voter registration purposes, to show that she was a registered voter in DeKalb County and thus to ensure that her provisional ballot would be fully accepted.

82.    The DeKalb County Board of Elections employee stated that Ms. Tate's curative information, however, was not needed. The employee noted that DeKalb had not called Ms. Tate. Despite her concerns, she was told everything was good to go.

83.    But as a matter of fact, her vote will *not count* as Defendant DeKalb is applying the law. DeKalb showed no understanding of how Ms. Tate could prove that she was lawfully registered in DeKalb County. If DeKalb County's records had been correct – and had Ms. Tate been a lawful resident of Cobb County – she never should have been given a provisional ballot in the first place.

84.     The only way Ms. Tate's vote will count is additional time to cure the flaw, both for her and for DeKalb County to understand her dilemma.

85.     Ms. Tate is not alone. For example, the Fulton County Board of Registration and Elections has reported rejecting **1,556** provisional ballots as of November 9, 2018. Of those, nearly 1,000 were disqualified because they were cast by voters whose registration records reflected a county other than Fulton.[8]

86.     The Secretary of State's representation in a recent filing in this Court could be an indication that some counties are having more difficulty with the certification process than others. *See Common Cause Georgia v. Kemp*, No. 1:18-cv-05102-AT, Defendant's General Submission in Response to Court's Request for Information (Doc. 40) (N.D. Ga. Nov. 9, 2018).

87.     Even without this confusion and conflicting information, curing provisional ballots would be a time-consuming process.  With regard to registration discrepancies, registrars in each case conduct research by accessing a variety of information from different sources.  The primary resource is Georgia's voter registration system ("ENET"), but registrars can also use other resources

---

[8] Bluestein, Greg, GEORGIA ELECTION: A weekend clash over how many gov votes are still uncounted, Atlanta Journal-Constitution (Nov. 10, 2018), available at https://politics.myajc.com/blog/politics/georgia-election-weekend-clash-over-how-many-gov-votes-are-still-uncounted/dUpaJi6Yw9NXH8NxXcovbM/

such as paper voter registration applications, supplement documents from paper

voter files, and external resources like Department of Driver's Services records.

As one Georgia county director of elections explained to the press this week,

"[w]e're going to look through all the records we received … [W]e're going to do

a lot of research to see if that person is registered or not."  Amidst the confusion

and backlogs that counties are facing, there is no reason to believe that counties

have the ability to adequately conduct this research on this unnecessarily

abbreviated timeframe.

88.    Simply put, the three-day cure period for provisional ballots is

unworkable in the current circumstances, and if allowed to be enforced, will

abridge the rights of Georgia voters through no fault of their own, possibly

numbering in the thousands of voters.

### NO STATE INTEREST JUSTIFIES THESE BURDENS

89.    While providing Georgia counties more time beyond November 9,

2018 is thus critical to ensure that thousands of voters are not disenfranchised,

there is no countervailing state interest in prohibiting them from curing ballots a

few days after this date.

90.    As an initial matter, the Georgia legislature has publicly

acknowledged that the rights of electors are paramount over the timing of

certifying the returns.  *See* O.C.G.A. § 21-2-230(g) ("The election superintendent shall not certify such consolidated returns until such hearing is complete and the registrars have rendered their decision on the challenge.").

91.    There is, in any event, no conflict between protecting voters' rights and timely certifying the election return. Ordinarily, counties must certify their election results to the Secretary of State by the Monday following the election, though this year the current deadline is Tuesday, November 13, 2018, at 5 p.m.[9] The Secretary of State in turn must certify the election results by Tuesday, November 20, 2018. O.C.G.A. § 21-2-499.

92.    There is no legitimate state or regulatory interest in counting only provisional ballots that county boards are able to cure by November 9, when counties do not currently have to certify their election results until the end of the day on November 13.  Thus, the proposed relief should not affect any of the Secretary of State's own runoff timelines.

93.    What is more, the Georgia Election Code already requires counties to have publicly commenced the computation and canvassing of returns at noon on the day following the election, and thus contemplates that this canvassing would

---

[9] The statute provides that the certification must occur on the Monday following the election, *see* O.C.G.A. § 21-2-493(k), but in 2018 that day falls on the observation of Veterans Day, a federal holiday.

occur while provisional ballots are being cured within the statutory three-day timeframe.  This canvassing is occurring also as military and overseas ballots are still being received; such votes may be received up to three days after election day.  O.C.G.A. § 21-2-386(a)(G).

94.    Finally, the counties are already under a restraining order not to reject some provisional ballots before the certification deadline in another set of cases, *Martin v. Kemp*, 1:18-cv-4776-LMM (N.D. Ga.) and *Georgia Muslim Voter Project v. Kemp*, 1:18-cv-4789-LMM (N.D. Ga.).  In those cases, the Court concluded that plaintiffs had shown a substantial likelihood of success that Defendants' procedures for verifying signatures on absentee ballots violated voters' procedural due process rights.  On that basis, the Court issued a temporary restraining order that, among other things, required Defendants to treat absentee ballots with purported signature mismatches as provisional ballots and then to provide affected voters with notice and an opportunity to cure.  *See* Temporary Restraining Order, *Martin*, 1:18-cv-4776, Doc. 32 (N.D. Ga. Oct. 25, 2018).

95.    Importantly, the Court's order specifically permits this process to continue up until the certification of the consolidated returns of the election by the election superintendent.  *Id.* at 2.  The order makes clear, however, that appeals not resolved by 5 p.m. on the certification deadline shall not delay certification unless

those votes would change the outcome of the election. *Id.* The result is that the relief requested in this Complaint would not delay any aspect of the certification process for the final statewide returns.

96.     For these reasons, there are no interests of sufficient weight preventing this Court from extending the deadline to cure provisional ballots, or for that matter, from extending the deadline for counties to certify their election returns through and including the day before the Secretary of State must certify the consolidated election returns from 159 counties in Georgia.

## CAUSES OF ACTION

### Count I –Violation Of The Fundamental Right To Vote Under The First And Fourteenth Amendments (Absentee Ballots)

97.     Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs.

98.     Under the First Amendment and the Fourteenth Amendment, any state election regulation that imposes non-discriminatory restrictions on the right to vote must be justified by an important regulatory interest. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

99.     The government cannot infringe upon the right to vote without adequate justification, and the greater the magnitude of the infringement, the stronger the justification must be. A Court must "weigh 'the character and

magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justification for the burdens imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

100.   Defendant Crittenden and her co-Defendants, including the Defendant Class, have the duty to ensure the integrity of the Election.

101.   Acting under color of state law, Defendants have deprived Plaintiffs of rights, privileges, and immunities secured by the U.S. Constitution – namely the fundamental right to vote.

102.   Affected absentee mail-in voters have no opportunity to cure the alleged material flaw in their ballots under O.C.G.A. 21-2-386(a)(1)(C).

103.   The burden imposed on absentee mail-in voters without an opportunity to cure an immaterial flaw that nonetheless deprives them of their votes is severe.

104.   Defendants have no precise interest of sufficient weight that justifies the burdens imposed by applying O.C.G.A. § 21-2-386(a)(1)(C) to require

rejection of absentee mail-in ballots solely due to missing or insufficient oath information.

## Count II – Violation of the Due Process Clause of the Fourteenth Amendment (Absentee Ballots)

105.   Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs.

106.   Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person of … liberty … without due process of law." This due process principle protects the fundamental right to vote.

107.   A claim for procedural due process lies when there is a constitutionally protected liberty or property interest and a governmental failure to provide an appropriate level of process.

108.   Defendant Gwinnett's administration of its absentee ballot program has resulted and in the absence of relief will result in absentee mail-in ballots being rejected without providing the elector any form of process to remedy the immaterial flaw.

109.   When Defendant Gwinnett rejects absentee ballots on the basis that that they do not contain requested information (information that by law is not required), Defendant Gwinnett violates the Due Process Clause by depriving

affected individuals of their right to vote without adequate procedural due process, in the form of pre-rejection notice and an opportunity to be heard.

110.   As a result of Defendant Gwinnett's rejection of absentee mail-in ballots without providing voters with meaningful notice and an opportunity to cure, it would be improper, unfair, and contrary to the Fourteenth Amendment's guarantee of due process of law for Defendant Gwinnett, or any member of the Defendant Class, to continue to reject absentee ballots for missing or insufficient oath information.

111.   In the absence of technical and legal direction from Defendant Crittenden, it would be improper, unfair, and contrary to the Fourteenth Amendment's guarantee of due process of law for any county registrar to continue to reject absentee ballots for missing or insufficient oath information.

### Count III – Violation of the Equal Protection Clause of the Fourteenth Amendment (Absentee Ballots)

112.   Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs.

113.   Under the Equal Protection Clause of the Fourteenth Amendment, "citizens enjoy 'a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction.'" *Citizen Center v. Gessler*, 770 F.3d 900, 918 (10th Cir. 2014) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336

(1972)). Thus, "state actions in election processes must not result in 'arbitrary and disparate treatment'" of voters. *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 234 (6th Cir. 2011) (quoting *Bush v. Gore*, 531 U.S. 98, 105 (2000)).

114.   Registered voters have a constitutionally protected right under the Equal Protection Clause of the Fourteenth Amendment to participate in elections on an equal basis with other registered voters.

115.   In rejecting absentee mail-in ballots due to missing or insufficient oath information provided by the voter, without allowing the voter the ability to cure the flaw and after the polls have closed, Defendant Gwinnett (and any other county applying this statutory provision in this way) deprives absentee mail-in voters in the Election of the equal protection of the laws in violation of the Fourteenth Amendment.

116.   Depriving individuals of their fundamental right to vote is undoubtedly a severe burden.

**Count IV –Violation Of The Fundamental Right To Vote Under The First And Fourteenth Amendments (Provisional Ballots)**

117.   Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs.

118.   As set forth above, enforcing the requirement that county boards cannot count cure provisional ballots after November 9—even though they are not

required to certify the consolidated returns of the election until four days later—
would impose significant burdens on the fundamental right to vote.  In light of the
historic numbers of provisional ballots cast in this election, and the burdens on the
county due in part to improper actions by Defendant Crittenden's predecessor,
Brian Kemp, many voters will be disenfranchised for races up and down the ballot
because there simply has not been enough time to cure their provisional ballots.

119.   At the same time, there is no regulatory interest in enforcing the three-
day cure period O.C.G.A. § 21-2-419 under the circumstances presented here.
Although Defendants may assert a governmental interest in convenience, finality,
or simplicity in closing the counting of provisional ballots by November 9, this
interest is minimal.  As noted, in light of the temporary restraining order in the
*Martin* case, county boards will not be finalizing their vote tally until at least
November 13 in any event.  There is no legitimate reason to prohibit the curing of
provisional ballots that can be cured prior to certification while absentee ballots are
still being cured at that time as well.

120.   The result is that providing the relief requested in this complaint will
engender no delays in certifying the final results and not require the Defendants to
develop any additional processes. Thus, the State has no interest of sufficient

importance to outweigh the undue burden that application of O.C.G.A. § 21-2-419 would place on eligible voters.

121.   Although, upon information and belief, the Secretary of State's office has informed the press of its intent to certify the state-wide results on November 14, 2018, it is under no obligation to do so until Monday, November 20. O.C.G.A. § 21-2-499.

122.   The Secretary of State has thus admitted that a Friday cure period has no real impact on her ability to certify the election – indeed, she has already stated that she intends to certify the day after all counties have submitted their certified returns to her office. This in itself demonstrates the irrationality of a cure period that ends days prior to county and state certification. Defendants have no precise interest of sufficient weight that justifies the burdens imposed by applying O.C.G.A. § 21-2-493 to the Election

123.   Further, rejecting provisional ballots because they were cast in a different county from the voter's registration address unconstitutionally deprives such voters of their fundamental right to vote – particularly where registration errors and administrative confusion appear to have led to exponentially greater confusion on behalf of the voters.

### Count V – Violation of the Due Process Clause of the Fourteenth Amendment (Provisional Ballots)

124.   Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs.

125.   Plaintiffs and their constituents possess a constitutionally protected right to vote.

126.   The Georgia statute requiring provisional ballots to be cured "not later than three days" following the election, O.C.G.A. § 21-2-419(c) has resulted and will result in ballots being rejected through no fault of the elector and without providing the elector an adequate process to remedy that rejection.

127.   The application of that statutory regime under these circumstances is unconstitutional.

128.   As a result of Defendant DeKalb's rejection of absentee mail-in ballots without providing voters with meaningful notice and an opportunity to cure, it would be improper, unfair, and contrary to the Fourteenth Amendment's guarantee of due process of law for DeKalb, or any member of the Defendant Class, to continue to reject provisional ballots without providing sufficient time for the voter to learn of the problem and attempt to provide a cure accepted by knowledgeable county elections officials.

129.   In the absence of technical and legal direction from Defendant Crittenden, it would be improper, unfair, and contrary to the Fourteenth

Amendment's guarantee of due process of law for any county to continue to reject provisional ballots without the voter possessing an opportunity to cure.

### Count VI – Violation of the Equal Protection Clause of the Fourteenth Amendment (Absentee Ballots)

130.   Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs.

131.   As set forth above, enforcing the requirement in § 21-2-419(c) that provisional ballots cannot be cured later than three days after the election, results in arbitrary and disparate treatment of provisional voters depending simply on the resources of county boards to cure ballots within this narrow timeframe.

132.   DeKalb County, and, on information and belief, counties across Georgia, are turning to arbitrary and disparate treatment of provisional voters in light of the historically high volume and number of irregularities arising in the November 6, 2018 General Election.

133.   This arbitrary and disparate treatment of the right to vote is inconsistent with the Fourteenth Amendment.

\*   \*   \*

**WHEREFORE**, Plaintiffs DPG and the Abrams Campaign request the following relief:

A.      That the Court immediately issue an order enjoining Defendants and all members of the Defendant Class from certifying county or statewide election returns for the November 6, 2018 General Election until Wednesday, November 14, 2018;

B.      That the Court issue an order and judgment declaring federal and Georgia law to require county registrars to accept absentee mail-in ballots cast in the November 6, 2018 General Election on which the voter provided missing or insufficient oath information, where that missing or insufficient information does not substantially obstruct the county registrar from verifying the identity of the absentee voter;

C.      That the Court issue an order and judgment that counties accept evidence curing provisional ballots cast in the November 6, 2018 General Election, and that counties count ballots so cast and cured as set forth in O.C.G.A. § 21-2-419, through Wednesday, November 14, 2018 at 5:00 p.m.;

D.      That the Court issue an order and judgment that Defendants DeKalb County and Gwinnett County, and all similarly situated counties, treat provisional ballots cast in the November 6, 2018 General Election by a voter registered in another county as if they had cast ballots within the wrong precinct of the same county as described by O.C.G.A. § 21-2- 419(c)(2);

E.      That the Court issue an order and judgment that, as to the Defendant Class that has already certified election results, directing the Class to restore the votes of qualified electors as specified by this Court, and to certify and file corrected returns with Defendant Crittenden;

F.      That the Court issue an order and judgment enjoining Defendant Crittenden from refusing to accept any corrected election returns certified and filed by a county elections superintendent in response to an order of this Court; and

G.      Such other and further relief as this Court may deem just and proper.

**[signature block on following page]**

Dated:          November 11, 2018                Respectfully submitted,

                                                **KREVOLIN & HORST, LLC**

                                                */s/ Halsey G. Knapp, Jr.*
                                                Halsey G. Knapp, Jr.
                                                Georgia Bar No. 425320

One Atlantic Center, Suite 3250
1201 W. Peachtree Street., N.W.
Atlanta, Ga 30309
(404) 888-9700
(404) 888-9577
hknapp@khlawfirm.com

                                                **Sandler Reiff Lamb Rosenstein &
                                                Birkenstock P.C.**

                                                Dara Lindenbaum
                                                (*Pro hac vice* to be sought)

1090 Vermont Avenue NW
Suite 750
Washington, D.C. 20005
(202)734-6139
Lindenbaum@sandlerreiff.com

                                                *Attorneys for AFG Group Inc d/b/a
                                                Stacey Abrams for Governor and the
                                                Democratic Party of Georgia, Inc.*