# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

THE DEMOCRATIC PARTY OF
GEORGIA, INC., AND AFG GROUP,

    Plaintiffs,

v.

ROBYN A. CRITTENDEN, IN HER
OFFICIAL CAPACITY AS SECRETARY
OF STATE OF THE STATE OF
GEORGIA, <u>et. al.</u>,

    Defendants,

and

GEORGIA REPUBLICAN PARTY, INC.

    Defendant-Intervenor.

CIVIL ACTION FILE

NO. 1:18-CV-5181-SCJ

## <u>ORDER</u>

This matter appears before the Court on the Plaintiffs' Emergency Motion

for Preliminary Injunction (Doc. No. [4]) filed by Plaintiffs on November 12, 2018.

After a hearing and review of the parties' submissions, the Court rules as follows.

## I. BACKGROUND

This case comes before the Court on the Complaint for Declaratory and Injunctive Relief and Emergency Motion for Preliminary Injunction filed by AFG Group and the Democratic Party of Georgia. Doc. Nos. [1]; [4]. The Complaint, which concerns the State of Georgia absentee ballot and provisional voting schemes, was filed against Defendant Robyn A. Crittenden, in her official capacity as Secretary of State for the State of Georgia ("Secretary Crittenden"), the five members of the Gwinnett County Board of Registration and Elections, Stephen Day, John Mangano, Alice O'Lenick, Ben Satterfield and Beauty Baldwin, in their official capacities ("Gwinnett"), and the five members of the DeKalb County Board of Registration and Elections, Michael Coveny, Anthony Lewis, Leona Perry, Samuel Tillman and Baoky Vu, in their official capacities ("DeKalb"). This Court held a hearing on November 13, 2018, for the purpose of further discerning what issues to address in this order.

## A. Relief Requested

Plaintiffs in this case are requesting that this Court grant them two types of relief. First, Plaintiffs seek declaratory and injunctive relief requiring the acceptance of certain absentee ballots. Specifically, Plaintiffs seek an order requiring Defendant Gwinnett to restore the votes of at least 1,095 qualified electors who properly submitted absentee ballots in the November 6, 2018 General Election and were rejected by Gwinnett due to missing or insufficient information requested in the elector oath. Plaintiffs also seek to have the Court direct any of the other 158 counties that have already certified election results to restore the votes of qualified electors who properly submitted absentee ballots in the election and were rejected due to missing or insufficient information requested in the elector oath and to certify and file corrected returns. They further seek to have all counties that have not certified their results from the election accept these ballots and count them. The second request for relief which Plaintiffs seek is injunctive relief and relates to provisional ballots. Plaintiffs are seeking an order and judgment from the Court:

a. Requiring counties to accept cures for and to verify provisional ballots until November 14, 2018 at 5:00 p.m.;
b. Requiring counties to treat provisional ballots by a voter registered in another County the same as they would provisional

ballots cast by a voter within the wrong precinct of the same county as described by O.C.G.A § 21-2-419(c)(2);

c. As to the counties that has already certified election results, directing the counties to restore the votes of qualified electors;

d. Directing Secretary Crittenden to instruct those counties having not completed their certification of their results from the election to accept those ballots and count them; and

e. Enjoining the Defendant class and Secretary Crittenden from certifying their returns until November 14, 2018.

The Court takes judicial notice that there are at least three other cases related to the 2018 Georgia Election pending before other federal judges in this district: Georgia Coalition for the Peoples' Agenda, Inc. et al v. Kemp, 1:18-cv-04727-ELR (NDGa, Oct. 11, 2018); Martin et al v. Kemp et al, 1:18-cv-04776-LMM (NDGa, Oct. 15, 2018); Common Cause Georgia v. Kemp, No. 1:18-cv-5102-AT (NDGa, Nov. 5, 2018). The parties have filed notices of supplemental authority containing orders issued by Judge Totenberg and Judge May. Doc. Nos. [9], [30].

The Court will focus its inquiry on the following four issues:

1. Whether the Secretary of State should be enjoined to require counties to count absentee ballots with incorrect birthdates.

2. Whether the Secretary of State should be enjoined to require counties to count absentee ballots with incorrect residence addresses.

3. Whether the Court should require the Secretary of State to extend the three-day period for counting provisional ballots.

4

4. Whether the Secretary of State should be enjoined to require counties to count the provisional ballots of voters who voted in incorrect counties as if they had merely voted in incorrect precincts, as described by O.C.G.A 21-2-419(c)(2).

**B. Absentee Ballots**

Georgia law authorizes any eligible voter to cast his or her absentee ballot by mail.  The first step in the absentee-voting process is for a voter to submit an absentee ballot application via mail, fax, email, or in person.  O.C.G.A. § 21-2-381(a)(1)(A).  A voter may submit an absentee ballot application as early as 180 days prior to the date of the primary or election through and including the Friday before the primary or election.  Id.  Absentee ballots cannot be issued the day before a primary or election.  O.C.G.A. § 21-2-384(a)(1)(2).

When an absentee ballot is requested, the county registrar or absentee ballot clerk must determine if the applicant is eligible to vote in the relevant primary or election by comparing the applicant's identifying information to the applicant's information on file with the registrar's office.   O.C.G.A. § 21-2-381(b)(1).

If the registrar determines that the signatures do not match, the clerk or the board of registrars "shall deny the application by writing the reason for rejection in the proper space on the application and shall promptly notify the applicant in

writing of the ineligibility." O.C.G.A. § 21-2-381(b)(2)(3). While there is no procedure by which an elector can contest the registrar's decision, the statutes do not prevent an elector whose application is rejected from applying a second time or voting in person.

If a voter's eligibility is confirmed, the registrar must mail an absentee ballot to the voter. O.C.G.A. § 21-2-381(b)(2)(A). When an absentee voter receives an official absentee ballot, the voter receives two envelopes. O.C.G.A. § 21-2-384(b). The voter must place the completed absentee ballot in the smaller of the two envelopes. Id. The smaller envelope must then be placed in the larger envelope, which contains the oath of the elector and a line for the elector's signature. O.C.G.A. § 21-2-384(b)-(c). All absentee ballots must be received by 7:00 p.m. on election day to be counted. O.C.G.A. § 21-2-386(a)(1)(F).

Upon receipt of each absentee ballot, the registrar or clerk must reject the ballot "[i]f the elector has failed to sign the oath, or if the signature does not appear to be valid, or if the elector has failed to furnish required information or information so furnished does not conform with that on file . . . or if the elector is otherwise found disqualified to vote[.]" O.C.G.A. § 21-2-386(a)(1)(C). The clerk

shall write "Rejected" across the face of the envelope, provide the reason for rejection, and "promptly notify the elector of such rejection." Id.

An elector whose ballot is rejected pursuant to O.C.G.A. § 21-2-386(a) may vote in the primary or election by either applying for a second absentee ballot at least two days prior to the election or primary, or voting in person through early absentee voting or at the elector's polling place on the day of the election or primary. Ga. Comp. R. & Regs. 183-1-14-.09.

## C. Provisional Ballots

Georgia has established a system for provisional voting. O.C.G.A. §§ 21-2-418 and 419. The statute providing for the right to cast a provisional ballot states, in relevant part:

> (a) If a person presents himself or herself at a polling place, absentee polling place, or registration office in his or her county of residence in this state for the purpose of casting a ballot in a primary or election stating a good faith belief that he or she has timely registered to vote in such county of residence in such primary or election and the person's name does not appear on the list of registered electors, the person shall be entitled to cast a provisional ballot in his or her county of residence in this state as provided in this Code section.

> (b) Such person voting a provisional ballot shall complete an official voter registration form and a provisional ballot voting certificate which shall include information about the place, manner, and approximate date on which the person registered to vote. The person shall swear or affirm in writing that he or she previously registered

to vote in such primary or election, is eligible to vote in such primary or election, has not voted previously in such primary or election, and meets the criteria for registering to vote in such primary or election. The form of the provisional ballot voting certificate shall be prescribed by the Secretary of State. The person shall also present the identification required by Code Section 21-2-417.

(c) Such person voting a provisional ballot shall complete an official voter registration form and a provisional ballot voting certificate which shall include information about the place, manner, and approximate date on which the person registered to vote. The person shall swear or affirm in writing that he or she previously registered to vote in such primary or election, is eligible to vote in such primary or election, has not voted previously in such primary or election, and meets the criteria for registering to vote in such primary or election. The form of the provisional ballot voting certificate shall be prescribed by the Secretary of State. The person shall also present the identification required by Code Section 21-2-417.

O.C.G.A. § 21-2-418.

Once a provisional ballot is cast, it will be counted if and only if the person

is later determined to have been entitled to vote. As set forth in O.C.G.A. § 21-2-

419:

(b) At the earliest time possible after the casting of a provisional ballot, but no later than the day after the primary or election in which such provisional ballot was cast, the board of registrars of the county or municipality, as the case may be, shall be notified by the election superintendent that provisional ballots were cast in the primary or election and the registrars shall be provided with the documents completed by the person casting the provisional ballot as provided in Code Section 21-2-418. Provisional ballots shall be securely

8

maintained by the election superintendent until a determination has been made concerning their status. The board of registrars shall immediately examine the information contained on such documents and make a good faith effort to determine whether the person casting the provisional ballot was entitled to vote in the primary or election.

(c)(1) If the registrars determine after the polls close, but not later than three days following the primary or election, that the person casting the provisional ballot timely registered to vote and was eligible and entitled to vote in such primary or election, the registrars shall notify the election superintendent and the provisional ballot shall be counted and included in the county's or municipality's certified election results.

(2) If the registrars determine after the polls close, but not later than three days following the primary or election, that the person voting the provisional ballot timely registered and was eligible and entitled to vote in the primary or election but voted in the wrong precinct, then the board of registrars shall notify the election superintendent. The superintendent shall count such person's votes which were cast for candidates in those races for which the person was entitled to vote but shall not count the votes cast for candidates in those races in which such person was not entitled to vote. The superintendent shall order the proper election official at the tabulating center or precinct to prepare an accurate duplicate ballot containing only those votes cast by such person in those races in which such person was entitled to vote for processing at the tabulating center or precinct, which shall be verified in the presence of a witness. Such duplicate ballot shall be clearly labeled with the word "Duplicate," shall bear the designation of the polling place, and shall be given the same serial number as the original ballot. The original ballot shall be retained.

(3) If the registrars determine that the person casting the provisional ballot did not timely register to vote or was not eligible or entitled to

vote in such primary or election or shall be unable to determine within three days following such primary or election whether such person timely registered to vote and was eligible and entitled to vote in such primary or election, the registrars shall so notify the election superintendent and such ballot shall not be counted. The election superintendent shall mark or otherwise document that such ballot was not counted and shall deliver and store such ballots with all other ballots and election materials as provided in Code Section 21-2-500.

Finally, under O.C.G.A. § 21-2-418, counties have three days following the election to process provisional ballots to determine whether they will be counted.

### D. Evidentiary Submissions

Plaintiffs have presented various affidavits and declarations in support of their argument.

John DeLapp, Data Director for AFG, presented a declaration in which he stated that as of the morning of November 12, 2018, there is an estimated figure of in excess of 26,000 outstanding ballots cast. Doc. No. [17-3], p. 4, ¶ 11. Plaintiffs state that they dispute testimony (in a prior case) from Secretary Crittenden's Elections Director that the number of provisional ballots cast was approximately 21,000. Doc. No. [4], p. 2, n.1.

Rachel Knowles, a field organizer in the Dekalb County office of the Democratic Party of Georgia, submitted an affidavit claiming that she "spoke

with voters who sought to cure the status of their provisional ballots, but [who] were . . . unable to do so . . . . " Doc. No. [5], ¶ 7.  She also states that election officials were "unable to give the voters confirmation that their provisional ballot would be counted."  Id.  From the affidavit:

> For example, when voters go to [DeKalb County Board of Elections (DCBOE)] to cure their provisional ballot, they are asked if they were given paperwork by a poll worker. If yes, DCBOE copies the voter's ID and has them fill out a form that I believe asked for their name and where they voted on Election Day though I did not see the form personally. The voters are then sent away, with DCBOE telling them that they will get a letter next week letting them know why they had to vote provisionally and whether or not their vote was counted. There is no confirmation whether these voters' ballots will be counted. I witness one of the workers not even confirming with people whether they voted provisionally. She asked voters if they were given instructions to come here by the poll workers. If the voter responds no, she tries to send them away.

> Doc. No. [5].

Terakesha Graves submitted an affidavit stating that she "moved back" to DeKalb County without re-registering with the county board of elections.  Doc. No. [7].  On election day, she was told by a poll worker that she was registered to vote in Henry County, not DeKalb County.  Id.  Ms. Graves states that she was told by the poll worker that "I could not vote on the DRE machine but that I could vote on a provisional ballot, which was handed to me. She did not instruct me to

travel to Henry County and to cast my vote there." Id. Ms. Graves went to the DeKalb County Board of Elections on November 9, 2018 and the election representative was not able to tell her "either way" if her provisional ballot would be counted. Id. ¶ 7. A second elections representative said that "they wouldn't know until the end of the day whether [her] ballot would be accepted or rejected." Id. ¶ 8.

Lona Tate submitted an affidavit that she arrived to vote at a polling place in DeKalb County on election day, but was told that she was registered to vote in Cobb County instead and that she should go there. Doc. No. [8]. After explaining that she did not have a car, Ms. Tate claims that the assistant poll manager said she would need to vote the "old fashioned way," by provisional ballot. Id.

Lauren Groh-Wargo, Campaign Manager of AFG (Stacey Abrams for Governor), submitted an affidavit alleging unspecified problems with provisional ballots. Doc. No. [10]. Rebecca DeHart, executive director for the Democratic Party of Georgia ("DPG"), submitted an affidavit stating that DPG "has received thousands of calls into its Voter Protection Hotline from aggrieved absentee voters in Gwinnett County requesting DPG's assistance." Doc. No. [11].

Quinn Mulholland, a field organizer in the Dekalb County office of the DPG, submitted an affidavit that "DPG continues to receive calls and complaints from voters who have been unable to check the status of their provisional and absentee ballots, and who have been deprived of the opportunity to cure those ballots, even when such voters at DCBOE in person."  Doc. No. [12].

## II.  PRELIMINARY MATTERS

The Court first addresses several preliminary matters relevant to the Court's power to hear this case and to the scope of the relief the Court is able to grant.

### A.  Class Action Status

Plaintiffs include "class action" in the caption of their suit and make allegations regarding "the Defendant class" throughout their complaint.  <u>See</u> Doc. No. [1].  They propose a Defendant class including the boards of registrars and election superintendents of all of Georgia's 159 counties.  <u>Id.</u> at 14.  However, Plaintiffs have not named, served, or notified any of these other potential class members of this suit.  Nor have Plaintiffs filed a motion requesting certification of such a class.  Rather, Plaintiffs submit in a footnote that the Court might "deem[] it necessary to certify a defendant class."  <u>Id.</u> at 1 n.1.

Federal Rule of Civil Procedure 23 outlines the requirements and procedures for class certification. Fed. R. Civ. P. 23. The Court will not overlook these procedural safeguards and take action simply because Plaintiffs suggest in a footnote that it might be appropriate. At this stage of the litigation, absent class certification, the only Defendants before the Court are the Secretary of State, the members of the Gwinnett Board of Registration and Elections and the members of the DeKalb Board of Registration and Elections. Thus, any potential relief the Court could award in a preliminary injunction is limited to these Defendants.

## B. Standing

Defendants argue that Plaintiffs do not have standing to bring their claims. To establish standing, Article III requires a plaintiff to show three things:

> First, the plaintiff must have suffered, or must face an imminent and not merely hypothetical prospect of suffering, an invasion of a legally protected interest resulting in a "concrete and particularized" injury. Second, the injury must have been caused by the defendant's complained-of actions. Third, the plaintiff's injury or threat of injury must likely be redressible by a favorable court decision.

Fla. State Conference of NAACP v. Browning, 522 F.3d 1153, 1159 (11th Cir. 2008) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)).

1. *Injury in fact*

An organization may demonstrate a concrete, imminent injury either through a "diversion-of-resources" theory or through an associational-standing theory. See Arcia v. Fla. Sec'y of State, 772 F.3d 1335, 1341–42 (11th Cir. 2014). Here, Plaintiffs assert both types of standing. Doc. No. [1], ¶¶16, 19, 27. "Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." Arcia, 772 F.3d at 1341.

Under an associational-standing theory, "[a]n organization has standing to enforce the rights of its members 'when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Browning, 522 F.3d at 1160 (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000)). "[W]hen the relief sought is injunctive, individual participation of the organization's members is not normally necessary. The nub is whether the members themselves would have standing." Browning, 522 F.3d

at 1160.  The organization need only show that its members "face[] a probability of harm in the near and definite future" to establish injury that is sufficient to confer standing to seek prospective relief.  Id. at 1160–61.

The Court finds that Plaintiffs have successfully established standing to bring their claims regarding the rejection of absentee ballots and their challenges to the constitutionality of the statutory framework for curing and counting provisional ballots.  First, Plaintiffs have shown injury under both the organizational and associational frameworks.  With respect to organizational standing, Plaintiffs provide declaration evidence that they will be required to divert resources from existing uses to address both issues.  Doc. Nos. [10]; [11]. Both organizations describe how the rejection of absentee mail-in ballots has frustrated their organizational missions of increasing voter turnout and how the inadequate cure period and procedures for handling provisional ballots has forced them to shift resources away from preparing for the upcoming runoff election to providing assistance to members adversely impacted by the curative procedures.  Doc. Nos. [10], pp. 3–6; [11], pp. 3–6.

Defendants challenge Plaintiffs' claims of injury on the basis that Plaintiffs have not shown they diverted any resources from what they would normally be

doing during an election campaign. Doc. No. [12], p. 23–25. Defendants argue that there has been no change in existing law that would require Plaintiffs to do anything differently. Id. at 23. Defendants cite multiple cases that found standing where a change in a law or passage of a new law required a diversion of resources for an organization, but they do not cite any case that stands for the proposition that a change in law is *required* for the diversion-of-resources theory to apply. See id. at 23–24.

Under the current election circumstances, problems with how absentee and provisional ballots are being processed have emerged. Those problems have caused Plaintiffs to divert resources to address them, giving Plaintiffs a "direct stake" in this litigation. See Arcia, 772 F.3d at 1340 ("Injury in fact reflects the statutory requirement that a person be adversely affected or aggrieved, and it serves to distinguish a person with a direct stake in the outcome of a litigation — even though small — from a person with a mere interest in the problem.") (internal quotations omitted). It is immaterial whether the organizational injury resulted from a change in the law or a change in election-year conditions and circumstances that bring into focus potential problems with the state's statutory framework. The Plaintiffs' diversion of resources from preparation for the

upcoming runoff elections to assisting individuals impacted by the handling of absentee and provisional ballots is all the injury needed to meet the injury-in-fact requirement. See Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982) ("[C]oncrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.").

As for injury under an associational-standing theory, Plaintiffs need only show that at least one member faces an imminent threat of injury. Arcia, 772 F.3d at 1342. Given that the Democratic Party has tens of thousands of members who are active voters in the state, it is extremely unlikely that the rejection of absentee ballots and the curative process for handling provisional ballots will not affect a single Democratic Party member. This probable danger is sufficient to satisfy the injury prong for associational standing.

Defendants contend that Plaintiffs are unable to meet the third prong of associational standing because individual members' involvement is required in this suit, since voting "is an individual right." Doc. No. [12], pp. 27–28. Defendants assert that "individualized determinations will be required," but do not elaborate on what those determinations are or why an individual member's

participation is required.  Id. at 27.  Plaintiffs do not seek individual, retrospective relief for their members.  Rather, they seek prospective, injunctive relief directed at election officials.  Determining whether such relief is appropriate does not require the Court to craft individual remedies, nor does it require every Democratic Party member affected to participate in the suit.  Therefore, the Court finds that Plaintiffs sufficiently allege injury-in-fact under both an organizational and associational standing theory.

### 2. *Causation*

Defendant Gwinnett argues that Plaintiffs cannot meet the second standing requirement to show that the injury was caused by the county's actions.  Doc. No. [12], pp. 25–26.  However, the Court can trace a direct line between Gwinnett's (or any county's) decision to reject an absentee ballot for missing information, when that information is not material to verifying a voter's identity, and the resulting injury when that person's vote is not counted.  Likewise, the Court can trace a direct line between a county's failure to accept curative

information provided by a voter whose ballot was marked as provisional and that voter's resulting disenfranchisement.[1]

### 3. *Redressibility*

Finally, Defendants assert that Plaintiffs' injuries are not redressible by a favorable ruling of the Court. Id. at 26. Their cursory argument, devoid of supporting authority, is unpersuasive.[2] Plaintiffs allege injury to their organization mission. An injunction directed at the Secretary of State addressing

---

[1] Gwinnett cites Swann v. Secretary, 668 F.3d 1285 (11th Cir. 2012), to imply that the voters in this case are responsible for their own injury. However, Swann is distinguishable from the circumstances here. In that case, the plaintiff challenged a statute he claimed deprived incarcerated individuals of the right to vote by absentee ballot. Despite plaintiff's claims about the statute, he had received an application for an absentee ballot while in jail. He listed his home address under "Address as Registered" and left the address for "Ballot to be mailed" blank. Accordingly, his absentee ballot was mailed to his home address rather than to the jail. The Eleventh Circuit found he lacked standing, because he was responsible for his own injury. Id. at 1288. Unlike the circumstances in this case, in Swann, there were no intervening decisions by county officials over whether or not to mail an absentee ballot or how to apply the challenged statute. In the case at bar, individual voters may have omitted information or made mistakes, but between their error and the potential harm of disenfranchisement stands county officials' decisions about how to treat those errors and omissions.

[2] To the extent that Defendants' redressibility argument rests on Plaintiffs' failure to join the 157 other boards of registrars and election superintendents, the Court rejects this argument. The Secretary of State is a Defendant in this action and is the state official charged with enforcing election laws. The Secretary of State has the power to notify counties of errors in their computation and tabulation of votes, and to direct them to re-certify such returns. See O.C.G.A. § 21-2-499. Thus, it is possible that an injunction aimed at the Secretary of State can redress Plaintiffs' injuries.

election procedures can reduce Plaintiffs' burden of assisting voters. Likewise, any injunction that clarifies the legal requirements surrounding absentee ballots or clarifying the curative procedures for provisional ballots can reduce the number of rejected ballots, thereby addressing the individual harm suffered by Plaintiffs' members. Therefore standing is established.

### C.    Laches

Defendants also argue that Plaintiffs could have, and should have, brought these claims weeks ago. Doc. Nos. [12], pp. 15–16; [14], pp. 19–22. Thus, according to Defendants, Plaintiffs' unreasonable delay and the resulting prejudice to Defendants should bar their claims. To invoke the doctrine of laches, a defendant must show: "(1) there was a delay in asserting a right or claim, (2) the delay was not excusable, and (3) the delay caused [the defendant] undue prejudice." United States v. Barfield, 396 F.3d 1144, 1150 (11th Cir. 2005). Establishing such a defense is fact-dependent; therefore, courts generally do not prevent a plaintiff from proceeding with his claims when very little factual information is available. See, e.g., Espino v. Ocean Cargo Line, Ltd., 382 F.2d 67, 70 (9th Cir. 1967).

With the limited information before the Court, it cannot say that any delay on Plaintiffs' part was unreasonable or inexcusable. For example, many of the issues regarding voters experiences with the processing and curing of provisional ballots did not arise until after election day. At this juncture, Defendants have not convinced the Court that Plaintiffs' claims are barred due to any delay.

## III. LEGAL STANDARD

The Court considers four factors when deciding whether to issue a preliminary injunction pursuant to Federal Rule of Civil Procedure 65: (1) whether there is a substantial likelihood of success on the merits; (2) whether the preliminary injunction is necessary to prevent irreparable injury; (3) whether the threatened injury outweighs the harm that the preliminary injunction would cause to the non-movant; and (4) whether the preliminary injunction would be adverse to the public interest. Parker v. State Bd. of Pardons and Paroles, 275 F.3d 1032, 1034–35 (11th Cir. 2001). Injunctive relief is an extraordinary and drastic remedy and should not be granted unless the movant clearly establishes the burden of persuasion as to each of these four factors. Siegel v. LePore, 234 F. 3d 1163, 1176 (11th Cir. 2000). In addition, "[a]t the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be

admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" <u>Levi Strauss & Co. v. Sunrise Int'l Trading Inc.</u>, 51 F.3d 982, 985 (11th Cir. 1995. The decision to grant preliminary injunctive relief is within the broad discretion of the district court. <u>Majd–Pour v. Georgiana Cmty. Hosp., Inc.</u>, 724 F.2d 901 (11th Cir. 1984).

**IV. LEGAL ANALYSIS**

 **A. Likelihood of Success on the Merits**

  As stated above, the first factor when determining whether to issue temporary or preliminary injunctive relief is whether the movant has a substantial likelihood of success on the merits. <u>Parker</u>, 275 F.3d at 1035.

   *1. Absentee Mail-Ballots (Counts I, II, and III of the Complaint)*

  The Court will first consider whether Plaintiffs have established a substantial likelihood of success on the merits on their claims regarding the rejection of absentee mail-in ballots. Plaintiffs allege that county election officials who reject absentee mail-in ballots under O.C.G.A. § 21-2-386(a)(1)(C) solely due to missing or insufficient oath information—and more specifically, incorrect or omitted birth years and residential addresses—violate federal and state law. Doc. No. [4], p. 9. Thus, Plaintiffs would have the Court enjoin Secretary

Crittenden from certifying the Statewide Election results until all county election officials count absentee mail-in ballots with missing or insufficient oath information. Id. at p. 3. After due consideration, the Court agrees with Plaintiffs—but only to the extent that absentee mail-in ballots rejected solely because of a birth year error or omission must be counted statewide.

The Georgia Supreme Court has previously recognized that Georgia law "does not mandate the automatic rejection of any absentee ballot lacking the elector's place and/or date of birth." Jones v. Jessup, 279 Ga. 531, 533 n.5, 615 S.E.2d 529, 531 n.5 (2005) (citing O.C.G.A. § 21-2-386). Further, pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of a November 12, 2018, memorandum, in which Secretary Crittenden instructed all county election officials that they *can* count absentee mail-in ballots under O.C.G.A. § 21-2-386(a)(1)(C) despite birth year errors or omissions. Martin v. Crittenden, No. 18-cv-4776-LMM, Doc. No. [54], pp. 15–16.[3] While county election officials are

_____

[3]     Despite being referenced several times by the parties throughout the hearing on November 13, 2018, this memorandum was never filed in this case. It was, however, filed in Martin v. Crittenden, No. 1:18-cv-4776-LMM, at Doc. No. [54], pp. 15–16.

permitted to count such absentee mail-in ballots, however, the memorandum does not explicitly inform them that they are *required* to do so. Id.

The Court also takes judicial notice of a November 13, 2018, Order, in which Judge May enjoined Gwinnett County election officials from rejecting absentee mail-in ballots containing an error or omission relating to the voter's year of birth and ordered them to count such ballots. Martin v. Crittenden, No. 1:18-cv-4776-LMM, 2018 WL 5917860, at *7 (N.D. Ga. Nov. 13, 2018). Specifically, Judge May found that "Gwinnett County's process of rejecting absentee ballots solely on the basis of an omitted or incorrect birth year violate[s] the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B)[.]" Id. at *1. Section 10101(a)(2)(B) prohibits the practice of disqualifying voters "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material to determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). The Eleventh Circuit has explained that this provision turns on "whether, accepting the error as true and correct, the information contained in the error is material to determining the eligibility of the applicant." Fla. State Conf. of NAACP v. Browning, 522 F.3d 1153, 1175 (11th Cir. 2008). Therefore, Judge May

concluded that "a voter's ability to correctly recite his or her year of birth on the absentee ballot envelope is not material to determining said voter's qualifications under Georgia law." <u>Martin</u>, 2018 WL 4917860, at *5.[4]

In light of Judge May's Order, the Court is concerned by Secretary Crittenden's discretionary instructions to county election officials in the November 12, 2018, memorandum concerning the verification of absentee mail-in ballots. While Gwinnett County is now under one instruction from Judge May to count absentee mail-in ballots that contain a birth year error or omission, the other 158 counties in Georgia have been given the impression that they have the complete discretion to either count such ballots or reject them entirely. Consequently, this current statewide discrepancy regarding absentee mail-in ballots could not only lead to future voter confusion, but also to inconsistency in how such ballots are counted. <u>See</u> <u>Purcell v. Gonzalez</u>, 549 U.S. 1, 4–5 (2006)

---

[4] Notably, however, Judge May's Order did not go so far as to say that a missing signature, incorrect address, or other clerical errors are immaterial to verifying the identity of the voter. <u>Martin</u>, 2018 WL 4917860, at *4, n.4. In the Order, Judge May found that the plaintiffs offered "only conclusory statements and no supporting authority" for their claim that such information was immaterial. <u>Id.</u> Similarly, in this case, Plaintiffs have offered no supporting evidence that county election officials were rejecting absentee mail-in ballots due to missing or incorrect residential addresses. Therefore, the Court is unable to conclude that Plaintiffs have met their burden as to the residential addresses issue.

("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls."); see also Bush v. Gore, 531 U.S. 98, 109 (2000) ("When a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied.").

Thus, for the sake of statewide uniformity and assurance that all absentee mail-in ballots are equally treated, the Court adopts the rationale set forth in Judge May's Order and holds that absentee mail-in ballots rejected solely because of an omitted or erroneous birth date must be counted. Therefore, the Court finds that Plaintiffs have met their burden in showing a substantial likelihood of success on the merits with respect to their absentee mail-in ballot claims.

### 2. *Provisional Ballots (Counts IV, V, and VI)*

In Count IV Plaintiffs allege that Defendants have violated the fundamental right to vote under the First and Fourteenth Amendments of the United States Constitution by enforcing the requirement of Georgia law (i.e., the three-day cure period, O.C.G.A. § 21-2-419) that county boards cannot cure provisions ballots after November 9, 2018. Plaintiffs state that: "[i]n light of the

historic numbers of provisional ballots cast in this election, and the burdens on the county due in part to improper actions by Secretary Crittenden's predecessor, Brian Kemp, many voters will be disenfranchised for races up and down the ballot because there simply has not been enough time to cure their provisional ballots." Doc. No. [1], ¶ 118. Plaintiffs state that "[u]nder Georgia law, it appears that any voters whose provisional ballots have not been resolved by November 9, 2018 will be disenfranchised, simply because the counties in which they respectively reside could not address their ballots in time." Id. ¶ 6.

Plaintiffs also allege that "rejecting provisional ballots because they were cast in a different county from the voter's registration address unconstitutionally deprives such voters of their fundamental right to vote—particularly where registration errors and administrative confusion appear to have led to exponentially greater confusion on behalf of the voters." Id. ¶ 123.

In Count V of the Complaint, Plaintiffs allege a violation of the due process clause of the Fourteenth Amendment. Plaintiffs allege that "it would be improper, unfair, and contrary to the Fourteenth Amendment's guarantee of due process of law [Georgia counties], to continue to reject provisional ballots without providing sufficient time for the voter to learn of the problem and attempt to

provide a cure accepted by knowledgeable county elections officials."  Doc. No. [1], ¶ 128.[5]  Plaintiffs further allege that "[t]he application of that statutory regime [requiring that provisional ballots be cured 'not later than three days' following the election] under these circumstances is unconstitutional."  Id. ¶127.

Count VI alleges a violation of the Equal Protection Clause of the Fourteenth Amendment on the ground that "enforcing the requirement in [O.C.G.A.] § 21-2-419(c) that provisional ballots cannot be cured later than three days after the election, results in arbitrary and disparate treatment of provisional voters depending simply on the resources of county boards to cure ballots within this narrow timeframe."  Doc. No. [1], ¶ 131.

At the November 13, 2018 hearing, Plaintiffs, through Counsel, clarified that they are not asserting a facial attack on O.C.G.A. § 21-2-419 so as to have it declared illegal for all time.  Plaintiffs' Counsel stated that they are attacking the statute, as it is applied to the circumstances of the 2018 General Election.  To this regard, the Court's rulings are in the context of an as-applied constitutional challenge to certain portions of Georgia's statutory election scheme.

_____

[5] Paragraph 128 of the Complaint references "absentee ballots," however, the Court infers that the Plaintiffs meant "provisional ballots."

### i. **Enforcement of the statutory requirement that counties cannot cure provisional ballots after three days (Counts IV and VI)**

With respect to Counts IV and VI of the Complaint, in their motion, Plaintiffs assert that voters are slated to be disenfranchised because there has not been enough time to cure their provisional ballots. Doc. No. [4], p. 13.

In opposition to the Plaintiffs' motion, Secretary Crittenden filed a Declaration of Chris Harvey, Elections Director for the Office of the Secretary of State for the State of Georgia, in which he stated that he had not received any reports from county election officials that they were unable to accurately determine the validity of provisional ballots cast in their jurisdiction during the statutory period of three days following the election. Doc. No. [33], ¶ 9.

After review, the Court finds that there is a lack of evidentiary support for Plaintiffs' contention that there has not been enough time to cure the provisional ballots filed in the 2018 General Election. Accordingly, Plaintiffs have not met their burden of persuasion as to a likelihood of success on the merits as to Counts IV and VI.

## ii. <u>**Out of county provisional ballots (Count IV)**</u>

In their motion, Plaintiffs seek an order for the Court to declare that counties treat provisional ballots cast in the November 6, 2018 General Election by a voter registered in another county as if the voter had cast the ballot within the wrong precinct of the same county.   Doc. No. [4], p. 4.  At the hearing, Plaintiffs referenced Judge Totenberg's order (cited above) as a roadmap to make such declaration.

Under Georgia's current election scheme, a ballot cast out of the voter's county of residence is not counted.  O.C.G.A § 21-2-218(f) ("No person shall vote in any county or municipality other than the county or municipality of such person's residence except as provided in subsection (e) of this Code section.").

After the hearing and pursuant to the Court's request, Plaintiffs filed a response in support of their motion, concerning how many provisional ballots were cast by a voter in what the county believed is their county of residence, because voter registration records showed the voter as registered in another county.   Doc. No. [37].   In their response, Plaintiffs state that they "cannot produce a reliable, fixed number of voters who cast provisional ballots because they were voting in a county other than their county of residence (according to

31

state voter registration records) in the November 6, 2018 General Election, for several reasons, to include:  lack of reliable form, handwritten forms, and use of different codes by the counties. Doc. No. [37], p. 2.  Plaintiffs also state that "according to their compiled records, 13,138 provisional ballots were tagged by county poll officials with the code "OP,"[6] or some variation thereof, but analysis of which specific ballots were cast in a county other than the county of residence according to state voter registration records, versus out of precinct within the same county according to state voter registration records, is not available at this time."  Doc. No. [37], pp. 3–4.  Plaintiffs also state that "the Democratic Party of Georgia states that it has received at least 456 incident reports, compiled by poll watchers or Hotline attendees, in which a registered voter seeking to cast a ballot in one county was told, contrary to the voter's understanding of her registration, that the voter resided in a different county and needed either to return to that different county to vote or to vote provisionally, through November 9, 2018."  Doc. No. [37], p. 4.

---

[6] In <u>Common Cause Georgia v. Kemp</u>, No. 1:18-cv-5102-AT, the court stated that the Code "OP" means "out of precinct." (NDGa, Nov. 12, 2018).

"Although the United States Constitution, and Supreme Court decisions interpreting the Constitution, give primary responsibility for administering and regulating elections to the States, the States must adhere to certain constitutional and statutory requirements." Sandusky Cty. Democratic Party v. Blackwell, 387 F.3d 565, 569 (6th Cir. 2004).

"The Supreme Court has rejected a 'litmus-paper test' for '[c]onstitutional challenges to specific provisions of a State's election laws' and instead has applied a 'flexible standard.'" Common Cause/Georgia v. Billups, 554 F.3d 1340, 1352 (11th Cir. 2009). The United States Supreme Court has held that:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." Id., at 789, 103 S.Ct., at 1570; Tashjian, supra, 479 U.S., at 213–214, 107 S.Ct., at 547–548. Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." Norman v. Reed, 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally

sufficient to justify" the restrictions. Anderson, 460 U.S., at 788, 103 S.Ct., at 1569–1570; see also id., at 788–789, n. 9, 103 S.Ct., at 1569–1570, n. 9.

Burdick v. Takushi, 504 U.S. 428, 434 (1992).

The following principles also guide the Court's analysis: "[o]nly in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation." Curry v. Baker, 802 F.2d 1302, 1314 (11th Cir. 1986). "We agree that federal courts should refrain from holding a state election law unconstitutional when a reasonable alternative course of action exists." Roe v. State of Ala. By & Through Evans, 43 F.3d 574, 582 (11th Cir. 1995).

In argument and briefing, the Secretary of State asserts a state interest of prevention of voter fraud. In his Declaration, the Secretary of State's Elections Director stated that "[i]f the state allowed out of county voting, there would be no practical way of knowing if a voter voted in more than one county. Voter registration occurs at the county level [and] [p]rovisional ballot determination occurs at the county level." Doc. No. [33], ¶ 11. "Countering the State's compelling interest in preventing voter fraud is the plaintiffs' strong interest in exercising the 'fundamental political right' to vote." Purcell v. Gonzalez, 549 U.S.

1, 4 (2006). However, the Supreme Court has clearly stated that the right to vote

is "not absolute" in terms of where and when a citizen's ballot is cast:

> It is beyond cavil that "voting is of the most fundamental significance under our constitutional structure." Illinois Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979). It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute. Munro v. Socialist Workers Party, 479 U.S. 189, 193, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986). The Constitution provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections. Sugarman v. Dougall, 413 U.S. 634, 647, 93 S.Ct. 2842, 2850, 37 L.Ed.2d 853 (1973); Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 217, 107 S.Ct. 544, 550, 93 L.Ed.2d 514 (1986). Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974).

Burdick, 504 U.S. at 434.

In applying the above-stated test and weighing applicable interests,

without more evidence to the contrary, this Court finds for the limited purpose

of the pending motion for preliminary injunction that O.C.G.A § 21-2-218(f) is

narrowly drawn to advance the State of Georgia's important regulatory interest

of prevention of voter fraud and therefore constitutes a "reasonable,

nondiscriminatory restriction" upon the right to vote and not a "severe" restriction. Burdick, 504 U.S. at 434.[7] Plaintiffs do not present sufficient evidence to show that the State's interest in preventing voter fraud is unreasonable, nor do they show that the restriction was applied in a discriminatory manner. The restriction of in-county voting constitutes the "substantial regulation of elections" required by "common sense" to ensure that they are "fair and honest" and conducted with order, rather than chaos. Id.

### iii. Procedural due process (Count V)

As stated above, Plaintiffs argue that the application of the statutory regime (three-day rule) of O.C.G.A. § 21-2-419(c) is unconstitutional under the present circumstances. Doc. No. [1], ¶127. In their Complaint, Plaintiffs allege that "it would be improper, unfair, and contrary to the Fourteenth Amendment's guarantee of due process of law [Georgia counties], to continue to reject provisional ballots without providing sufficient time for the voter to learn of the problem and attempt to provide a cure [that will be] accepted by knowledgeable county elections officials." Doc. No. [1], ¶ 128

---

[7] Even if the in-county voting requirement is considered a "severe" restriction on the right to vote, the Court's decision does not change.

"A procedural due process claim has three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." Greene Dreams Shoe Care Ctr., Inc. v. Miami-Dade Cty., Fla., No. 1:13-CV-22231-UU, 2015 WL 519046, at *2 (S.D. Fla. Feb. 4, 2015) (citing Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003)).

In their motion and in support of their procedural due process claims, Plaintiffs cite the declarations of Rachel Knowles, Lona Tate, Terakesha Graves, and Rachel Knowles as examples of ballots being rejected through no fault of the elector and without providing the elector an adequate process to remedy the rejection. Doc. No. [4], p. 14. Each declaration is described in detail in the background section of this Order, *supra*.

In response and at the hearing, Defendants presented evidence that Ms. Tate did not actually change her voter registration until October 19, 2018 and therefore had not timely changed her address prior the voter registration deadline. Doc. No. [14-1], p. 5, ¶8 and p. 6. Secretary Crittenden asserts that Ms. Tate's situation has nothing to do with the application of the three-day window and does not prove Plaintiffs' case. Secretary Crittenden also asserts that there is

no evidence that Ms. Tate's vote was not counted.  The Court agrees that Ms. Tate's situation is not an example of a procedural due process claim.

As to the remaining examples, a review of the Georgia Elections Code shows that state procedures already provide for how the example situations cited by Plaintiffs were to be handled by the DeKalb County Board of Elections Office. See O.C.G.A. § 21-2-1, *et seq*. Without more, it appears that Plaintiffs' evidence is within the realm of failure to follow state procedures.  "[T]he law is well established that the mere failure to follow state procedures does not necessarily rise to the level of a violation of federal procedural due process rights. See Harris v. Birmingham Bd. of Educ., 817 F.2d 1525, 1528 n.15 (11th Cir.1987) (citing Maddox v. Stephens, 727 F.3d 1109, 1124 (11th Cir. 2013) ("[W]e emphasize that the violation of a state statute outlining procedure does not necessarily equate to a due process violation under the federal constitution. If otherwise, federal courts would have the task of insuring strict compliance with state procedural regulations and statutes.").

Accordingly, the Court finds that Plaintiffs have not demonstrated a likelihood of success as to Count V.

Because the Court finds that Plaintiffs have failed to demonstrate a substantial likelihood of success on the merits as to Counts IV through VI of the Complaint, the Court need not determine whether Plaintiffs established the remaining three prerequisites as to these three counts of the Complaint." Variable Annuity Life Ins. Co. v. Laeng, No. 8:12-CV-2280-T-33MAP, 2013 WL 500145, at *4 (M.D. Fla. Feb. 11, 2013).

## B. Remaining Preliminary Injunction Factors

Having found that Plaintiffs established a substantial likelihood of success on the merits on their claims regarding the rejection of absentee mail-in ballots, the Court now turns to the remaining preliminary injunction factors. To succeed under the second factor, Plaintiffs must show "a substantial likelihood of irreparable injury" if a preliminary injunction is not issued. Siegel, 234 F.3d at 1176. Generally, this means that a party cannot be made whole by monetary damages. See Odebrecht Constr., Inc. v. Sec'y, 715 F.3d 1268, 1289 (11th Cir. 2013). Here, the asserted injury is the disenfranchisement of certain voters who cast absentee or provisional ballots. Without a preliminary injunction, the voters whose ballots have been rejected on improper grounds or without a chance to cure the rejection will lose their opportunity to vote in this election; an injury that

money cannot compensate. Courts consistently find infringements of voting rights to qualify as irreparable injury. <u>League of Women Voters of N. Carolina v. North Carolina</u>, 769 F.3d 224, 247 (4th Cir. 2014); <u>Obama for Am. v. Husted</u>, 697 F.3d 423, 436 (6th Cir. 2012); <u>Cunningham v. Adams</u>, 808 F.2d 815, 821 (11th Cir. 1987). In light of the nature of the potential injuries Plaintiffs, the Court finds that Plaintiffs have established irreparable injury and this factor weighs in their favor.[8]

Next, to succeed under the third factor, the Court must consider whether the threatened injury to the movant outweighs the hardship that would be experienced by the opposing party if the preliminary injunction were issued. <u>Parker</u>, 275 F.3d at 1035. With respect to hardship, Defendants argue that Plaintiffs' requested preliminary injunction would delay the certification of the statewide election and thus disrupt any preparations made for any run-off elections. Doc. No. [14], pp. 17–18. Defendants further argue that their asserted

---

[8]     Defendants argue that Plaintiffs delay in challenging the election procedures involved in this case is an indication of their lack of irreparable harm. Doc. No. [16], pp. 13–15. However, as the Court discussed in Part III.A.3, many of the problems Plaintiffs' describe with the electoral procedures were not evident until during and after the election. The Court declines to view Plaintiffs timing as indicative of an absence of an irreparable injury.

hardships outweigh any alleged injury to Plaintiffs, who have an alternative state law remedy available to them in the form of Georgia's election contest procedures under O.C.G.A. § 21-2-522.

Any hardship that Defendants suffer due to a preliminary injunction, however, is outweighed by the harm that disenfranchised Plaintiffs would suffer should the Court not grant their requested preliminary injunction. As previously discussed, the disenfranchisement of the right to vote is an irreparable injury and one that cannot easily be redressed. Further, the state law remedy that Defendants suggest is available to Plaintiffs does nothing to alleviate the harm suffered by individual voters. Therefore, the Court finds that Plaintiffs have established that their threatened injury outweighs any hardship that would be experienced by Defendants if the preliminary injunction were issued.

Finally, to succeed under the fourth factor, the Court must determine whether Plaintiffs' requested preliminary injunction would be adverse to public interest. Defendants again argue that any disruption or delay in the certification of the statewide election—and consequently, any disruption or delay in any preparations made for run-off elections—would be adverse to public interest. Doc. No. [14], pp. 18–19. The Court, however, finds that public interest is better

served by ensuring that qualified absentee voters have the opportunity to vote and, more importantly, have their votes counted. See Charles H. Wesley Educ. Foundation, Inc. v. Cox, 408 F.3d 1349, 1355 (11th Cir. 2005) ("[T]he Plaintiffs' franchise-related rights [are] without question in the public interest."); see also Wesberry v. Sanders, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."). Accordingly, the Court finds that the preliminary injunction would not be adverse to public interest.

## IV.  CONCLUSION AND PARTIAL INJUNCTIVE RELIEF

Accordingly, Plaintiffs' Emergency Motion for Preliminary Injunction (Doc. No. [4]) is **GRANTED IN PART AND DENIED IN PART**.

Plaintiffs have shown that they are entitled to preliminary injunctive relief as to the absentee ballot (date of birth) issue.  Plaintiffs have *not* shown that they are entitled to preliminary injunctive relief as to the absentee ballot (residence) issue and provisional ballot issues.  The Court specifically **DENIES** Plaintiffs' request to extend the cure period and require the counting of out-of-county of residence provisional ballots.

The Secretary of State is **ENJOINED** from certifying the State Election results until she has confirmed that each county's returns include the counts for absentee ballots where the birth date was omitted or incorrect.

In the exercise of the Court's discretion, no bond is required pursuant to Federal Rule of Civil Procedure 65.

**IT IS SO ORDERED** this 14th day of November, 2018.

s/Steve C. Jones\
**HONORABLE STEVE C. JONES**\
**UNITED STATES DISTRICT JUDGE**